1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DENTAL HEALTH SERVICES, INC., et al.,

                    Plaintiffs,

          v.

TOBY MILLER, et al.,

                    Defendants.

CASE NO. 2:23-cv-00383-LK

ORDER DENYING MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED DISCOVERY

     This matter comes before the Court on motions filed by Plaintiffs Dental Health Services, Inc., Dental Health Services, and Dental Health Services of America (collectively, "DHS") for a temporary restraining order, Dkt. No. 2, and for expedited discovery, Dkt. No. 4. Specifically, DHS seeks an order prohibiting Defendants Josh Nace, Does 1 through 50, and "their agents, employees, attorneys, and those acting in concert with them, from using or disclosing DHS's confidential and trade secret information in any way and ordering Defendants to immediately return all DHS property, including electronic devices, in their possession, custody or control." Dkt. No. 2 at 1. DHS claims that without an injunction, it will "los[e] one of its biggest clients due to

ORDER DENYING MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED DISCOVERY - 1

1    demonstrable violations of its confidential business information and trade secrets." Dkt. No. 24 at

2    1. DHS initially sought a TRO against all Defendants, including Defendant Toby Miller, but in its

3    reply brief, it withdrew its request for a TRO against Miller. Dkt. No. 24 at 1. DHS also seeks

4    expedited discovery from both Nace and Miller. Dkt. No. 4; Dkt. No. 24 at 10–11. For the reasons

5    set forth below, the Court denies both motions.[1]

6                                    **I.    BACKGROUND**

7            Plaintiffs are three related entities: Dental Health Services, Inc. (a Washington

8    corporation), Dental Health Services, and Dental Health Services of America (both California

9    corporations). Dkt. No. 1-2 at 2–3. Dental Health Services, Inc. and Dental Health Services are

10   wholly owned subsidiaries of Dental Health Services of America. *Id.* at 3. DHS serves as a health

11   care service plan in Washington, Oregon, and California, and contracts with dental service

12   providers in those states. Dkt. No. 3 at 2.

13   **A.    Nace and Miller's Employment with DHS and Competitors**

14           Nace was employed with DHS from May 1998 through November 2021, and served as its

15   Vice President of Sales and Services from February 2019 until the end of his employment. *Id.* at

16   3. Miller began working for DHS in April 2000 as Group Services Manager. *Id.* When she ended

17   her employment with DHS in September 2022, she held the title of Client Services Manager. *Id.*

18   Because of the nature of their positions, both Nace and Miller served as points of contact for DHS's

19   clients and obtained knowledge of DHS's trade secrets and confidential information. *Id.* at 3–4.

20           Both Miller and Nace signed confidentiality agreements promising not to disclose DHS's

21   confidential information during or after their employment. Dkt. No. 3-1 at 7, 24. Those agreements

22   required them to "return to the Company all confidential documents and other materials" after their

23

24   ---
[1] Because the Court can decide the matter based on the parties' filings, it denies DHS's and Miller's requests for oral argument as unnecessary.

1    employment ended, and prohibited them divulging company information. *Id.* Miller and Nace also

2    signed the DHS Company Ethics and Business Practices Policy. Dkt. No. 3-1 at 14, 16; Dkt. No.

3    1-2 at 36. That policy required them to maintain as confidential "business proprietary/trade secret

4    information . . . without exception" and to not disclose any of the company's "confidential,

5    sensitive, or proprietary information or trade secrets which, if disclosed, would be detrimental to

6    the Company or its Employees." Dkt. No. 3-1 at 10. Nace also signed a Mutual Non-Disclosure

7    Agreement, which obligated him not to disclose confidential information and provided for

8    injunctive relief, among other remedies, in the event Nace breached the Agreement. Dkt. No. 3-1

9    at 3, 5.

10          DHS asserts that on Miller's last day of employment, she sent documents from her work

11   email account to her personal email account, including "information about one of DHS's biggest

12   clients . . . including contractual terms, financial terms, how certain reserves would be calculated,

13   plan codes, covered services, copayments, and exclusions provided by DHS to that entity." Dkt.

14   No. 3 at 6. Miller also failed to return her DHS-owned laptop that DHS had initially allowed her

15   to retain post-employment while she finished her duties as trustee of the company's Employee

16   Stock Ownership Plan ("ESOP"). *Id.* at 7. Miller now works for a competitor, Dominion National.

17   Dkt. No. 20 at 2–3. Her work involves servicing existing clients for a different type of dental plan

18   than the plans DHS sells and services. *Id.* at 3.

19          Nace also works for a competitor. He serves as the president of Health Resources, Inc.,

20   which does business as Paramount Delta. Dkt. No. 15 at 2. DHS and Paramount are currently

21   competing to win the business of a trade union in California. Dkt. No. 3 at 8. DHS contends that

22   Nace has disclosed DHS's confidential information to give his new employer a competitive

23   advantage in that process. Dkt. No. 2 at 6–7.

24

ORDER DENYING MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED
DISCOVERY - 3

**B.      DHS Files Suit and Moves for a TRO**

On March 13, 2023, DHS filed suit in King County Superior Court against Miller, Nace, and "Does 1 through 50." Dkt. No. 1 at 1; Dkt. No. 1-2 at 1. It alleged claims against Miller and Nace for breach of contract and breach of fiduciary duty, Dkt. No. 1-2 at 12, 15, and a claim against Miller for replevin, *id.* at 16–17. It also asserts claims against all Defendants for intentional interference with contractual relations and/or business expectancy; statutory and common law unfair competition; and misappropriation of trade secrets under the Washington Uniform Trade Secrets Act, Wash. Rev. Code § 19.108.010 ("UTSA"), and the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b) ("DTSA"). *Id.* at 13–16. The complaint seeks preliminary and permanent injunctive relief, restitution, exemplary damages, attorney fees, prejudgment interest, and other relief as the Court may find just and proper. *Id.* at 17–18.

On March 14, 2023, DHS filed an emergency motion for a TRO in superior court; the motion was scheduled to be heard on March 15, 2023. Dkt. No. 1-6 at 2. But before the hearing that day, Nace and Miller removed the case to this Court. Dkt. No. 1. On March 16, 2023, DHS filed an Emergency Motion for a Temporary Restraining Order, Dkt. No. 2, and a Motion for Expedited Discovery, Dkt. No. 4, in this Court. DHS electronically served the motions on Nace and Miller through the Court's electronic filing system. Dkt. No. 2 at 19; Dkt. No. 4 at 11. The Court ordered Defendants to respond to the motions by March 20, 2023, and allowed Plaintiffs to file an optional reply by March 22, 2023. Dkt. No. 11.

## II.   DISCUSSION

The Court first addresses its jurisdiction and then turns to the scope of the record, DHS's request for a TRO, Dkt. No. 2 at 11–15, and DHS's motion for expedited discovery, Dkt. No. 4.

A.      **Jurisdiction**

After removing the case based on federal question jurisdiction premised on the DTSA, Dkt. No. 1 at 3, Nace and Miller contend that DHS has failed to state a claim under the DTSA, Dkt. No. 14 at 9–14; Dkt. No. 18 at 15–20. Nevertheless, the Court is satisfied at this point that it has jurisdiction pursuant to 28 U.S.C. § 1331 based on the assertion of the federal claim in the complaint even if Defendants dispute the claim's merits. *See, e.g.*, *Trs. of the Screen Actors Guild-Producers Pension & Health Plans v. NYCA, Inc.*, 572 F.3d 771, 775 (9th Cir. 2009) ("[A]ny non-frivolous assertion of a federal claim suffices to establish federal question jurisdiction, even if that claim is later dismissed on the merits." (cleaned up)).

The DTSA vests federal courts with original jurisdiction over civil cases involving the misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). DHS alleges that Miller and Nace misused its trade secrets by using its client identities, those clients' preferences and sensitivities, DHS's pricing of insurance products and related services, and its marketing and corporate strategies to wrest business away from DHS. Dkt. No. 1-2 at 5, 9–11. That information can constitute trade secrets. *See, e.g.*, *Navigant Consulting, Inc. v. Milliman, Inc.*, No. C18-1154JLR, 2018 WL 3751983, at *4 (W.D. Wash. Aug. 08, 2018) (finding that plaintiff's client information, pricing, and strategic business and marking plans qualified as trade secrets); *Earthbound Corp. v. MiTek USA, Inc.*, No. C16-1150RSM, 2016 WL 4418013, at *9–10 (W.D. Wash. Aug. 19, 2016). The complaint also sufficiently alleges that DHS's trade secrets were used in interstate commerce. DHS comprises California and Washington companies that "contracted with dental service providers in Washington, Oregon, and California" and provided services in Oregon in 2022 and 2023. Dkt. No. 1-2 at 2–3, 9–10; *see also, e.g.*, *Wells Lamont Indus. Grp. LLC v. Richard Mendoza & Radians, Inc.*, No. 17-CV-1136, 2017 WL 3235682, at *1–3 (N.D. Ill. July

1    31, 2017) (finding complaint sufficient where it alleged that employer intended to market its

2    products in interstate commerce).

3         The Court also has supplemental jurisdiction over DHS's state law claims pursuant to 28

4    U.S.C. § 1367(a).

5    **B.    The Scope of the Record**

6         The Court briefly addresses the scope of the record. The Court does not consider the

7    evidentiary objections to the Neibert declaration that Nace improperly included in an exhibit to his

8    counsel's declaration. Dkt. No. 17-1 at 8; LCR 7. The Court does consider the hearsay objection

9    included in Nace's response brief, Dkt. No. 14 at 11, but nevertheless has reviewed the Neibert

10   declaration in its entirety because the Court may "consider hearsay in deciding whether to issue a

11   preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

12        The Court also considers Miller's surreply in which she seeks to strike paragraphs 3–14 of

13   the Declaration of Matthew Harrington. Dkt. No. 26; Dkt. No. 33 at 1. Miller argues that because

14   DHS submitted the Harrington declaration with its reply, she had no opportunity to respond. Dkt.

15   No. 33 at 1. The Court agrees for the most part and disregards paragraphs 3–12 because DHS could

16   have submitted that information earlier with its motion for a TRO, and Miller now has no

17   opportunity to respond. Dkt. No. 26 at 2–4. Paragraphs 13 and 14 discuss events occurring after

18   DHS filed its motion for a TRO, so DHS could not have included those events in its motion for a

19   TRO. *Id.* at 4–5. The Court therefore considers the information in those paragraphs. The Court

20   also considers the exhibits to Harrington's declaration because Miller does not object to them. Dkt.

21   No. 33 at 1.

22   **C.    DHS Is Not Entitled to a TRO Against Nace**

23        DHS initially accused Miller and Nace of conspiring to wrest away at least a "municipality

24   within King County" and "a trade union in California" using DHS's trade secrets and confidential

information. Dkt. No. 2 at 6. By the time of its reply brief, however, DHS had refined its theory, accusing Nace alone of trying to unfairly compete against DHS for a contract with United Domestic Workers in California. Dkt. No. 24 at 1. As explained below, DHS's failure to provide sufficient details regarding its alleged trade secrets and confidential information dooms its motion for a TRO.

    1.  <u>Legal Standards</u>

    Federal Rule of Civil Procedure 65 empowers the court to issue a TRO. Fed. R. Civ. P. 65(b). Like a preliminary injunction, a TRO is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (the standards applicable to TROs and preliminary injunctions are "substantially identical"). The Court will not "mechanically" grant an injunction for every violation of law. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Instead, plaintiffs seeking a TRO must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. The "possibility" of irreparable harm is insufficient; the moving party must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22.

    The Ninth Circuit employs a "sliding scale" approach, under which the four elements are balanced "so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). For example, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a [TRO], so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135 (internal quotation marks omitted). The moving party bears the burden of persuasion and must make a clear showing

that it is entitled to such relief. *Juarez v. Asher*, 556 F. Supp. 3d 1181, 1187 (W.D. Wash. 2021) (citing *Winter*, 555 U.S. at 22).

In addition to maintaining the status quo, DHS seeks to require Defendants to return to DHS certain records within 24 hours. Dkt. No. 2-1 at 4. Injunctions requiring parties to take affirmative action rather than simply maintaining the status quo are "particularly disfavored," *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)), and require the moving party to shoulder a "doubly demanding" burden of establishing "not simply that [it] is likely to succeed," but that "the law and facts *clearly favor* [its] position[.]" *Id.*

2. The UTSA and DTSA Claims

The UTSA prohibits "misappropriation" of trade secrets, which includes the wrongful acquisition, disclosure, or use of trade secrets under the circumstances set forth in the statute. Wash. Rev. Code § 19.108.010(2). The DTSA likewise prohibits misappropriation of trade secrets, including the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," and the use or disclosure of a trade secret without the owner's consent. 18 U.S.C. §§ 1839(5)(A), (5)(B).

Under the UTSA, a trade secret is

information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Wash. Rev. Code § 19.108.010(4)(a)–(b). Similarly, the DTSA defines trade secrets as

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3).

A plaintiff asserting a trade secret claim under the UTSA "must establish that its trade secrets were misappropriated," *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1178 (W.D. Wash. 2019), and that "legally protectable secrets exist," *Boeing Co. v. Sierracin Corp.*, 738 P.2d 665, 674 (Wash. 1987). Whether the specific information in question is a trade secret is an issue of fact. *Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 941 (Wash. 1999). To prevail on a trade secret misappropriation claim under the DTSA, the plaintiff must demonstrate that (1) that it possessed a trade secret, (2) the defendant misappropriated the trade secret; and (3) the "misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020); *see also Bombardier*, 383 F. Supp. 3d at 1178 ("The relevant portions of the DTSA and the UTSA are almost identical."). When a former employee "seeks to use the trade secrets of the former employer in order to obtain a competitive advantage, then competitive activity can be enjoined or result in an award of damages." *Ed Nowogroski Ins.*, 971 P.2d at 942; *see also* 18 U.S.C. § 1835(a).

The parties hotly contest whether the information DHS seeks to protect constitutes trade secrets. DHS relies solely on the declarations of Theresa Neibert, its Vice President and Chief

1    Enterprise Risk Management Officer. Dkt. Nos. 3, 25. Neibert states that Nace, in his role as

2    President of Paramount, "used DHS's customer lists, customer contact information, pricing, bid

3    strategies, and insurance product plans and network development to win the business of at least

4    one of DHS's incumbent and long-standing customers." Dkt. No. 3 at 7. But those vague and

5    general categories of information provide insufficient detail to constitute trade secrets. *Modumetal*,

6    425 P.3d at 879 (explaining that the plaintiff's "declarations and affidavits must provide specific,

7    concrete examples illustrating that the information meets the requirements for a trade secret."

8    (cleaned up)); *Bombardier*, 383 F. Supp. 3d at 1178 ("Although the complaint need not spell out

9    the details of the trade secret, a plaintiff seeking relief for trade secret misappropriation must

10   identify the trade secret with sufficient particularity to permit the defendant to ascertain at least the

11   boundaries within which the secret lies." (cleaned up)). The Court addresses each category in turn.

12       DHS argues that customer identities can be confidential trade secrets, Dkt. No. 24 at 8, but

13   its filings only address two clients, and the identities of both are public. Dkt. No. 17 at 1–2 (identity

14   of DHS's California trade union client, its plans, carriers, and rates are public information); Dkt.

15   No. 21 at 1–2 (identity of DHS's client the City of Seattle and plan information are available

16   online). A trade secret can only exist if it cannot be "readily ascertainable by proper means from

17   another source[.]" *Sierracin Corp.*, 738 P.2d at 674 (internal quotation omitted); *Ruckelshaus v.*

18   *Monsanto Co.*, 467 U.S. 986, 1002 (1984) (noting that "[i]nformation that is public knowledge or

19   that is generally known in an industry cannot be a trade secret."); *see also Applied Filter Tech. Inc.*

20   *v. Wetzel*, No. C09-1040JLR, 2009 WL 2424802, at *6 (W.D. Wash. Aug. 05, 2009) (customer

21   lists are not trade secrets when "the information is readily ascertainable."). DHS has not shown

22   that any client identity is a trade secret.

23       DHS also contends that Nace revealed information about "specific requirements imposed

24   on DHS by regulators." Dkt. No. 3 at 8; *see also* Dkt. No. 2 at 6–7. Defendants counter—and DHS

ORDER DENYING MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED
DISCOVERY - 10

1   has not disputed—that DHS's regulatory orders are publicly available. Dkt. No. 14 at 3; Dkt. No.

2   17-1 at 5–6; Dkt. No. 18 at 10; Dkt. No. 21 at 3. DHS has therefore failed to establish that the

3   regulatory requirements constituted legally protectable trade secrets.

4       DHS further avers that during the bidding process to renew the contract with its union

5   client, insurance broker Glenn Walker asked DHS "three questions which were startling in their

6   specificity and unique phrasing." Dkt. No. 25 at 3. Those questions "zeroed in on specific customer

7   service issues facing the DHS business unit Mr. Nace supervised," and "[c]ertain of these issues,

8   having to do with claims, were not known outside the company." *Id.*; *see also* Dkt. No. 3 at 8

9   (stating that Walker posed "targeted questions" based on "DHS's claims processing and call center

10  audits").[2] DHS concludes that the "combination of Mr. Walker's trio of suspiciously phrased

11  questions made it clear" that Nace "had to have been involved in feeding information to Mr.

12  Walker" to assist Paramount's bid. Dkt. No. 25 at 3. Although DHS argues that "[d]isclosing an

13  employer's confidential business information gives rise to a [trade secret] misappropriation claim,"

14  Dkt. No. 24 at 3, this is only true where the information constitutes a trade secret in the first

15  instance. DHS cites *Bombardier*, 383 F. Supp. 3d 1169, for its overbroad proposition, but in that

16  case the parties did not dispute the existence of certain trade secrets, and the court declined to

17  consider other alleged trade secrets that were not described with sufficient particularity. *Id.* at 1179

18  & n.3 (observing that documents identified the complaint were the only trade secrets the plaintiff

19  had alleged "with sufficient particularity" and citing with approval *Becton, Dickinson & Co. v.*

20  *Cytek Biosciences Inc.*, No. 18-CV-00933-MMC, 2018 WL 2298500, at *3 (N.D. Cal. May 21,

21

22  [2] In his declaration, Walker states that he asked questions about "DHS's current performance and prior regulatory issues" that are "extremely routine" for a broker in the bidding process. Dkt. No. 16 at 2–3. Because neither DHS nor Walker identifies the questions at issue, the Court cannot discern whether they are addressing the same or different lines of questions. Neibert suggests that the questions were about "customer service issues" relating to problems with "systems" that were fixed after Nace's tenure. Dkt. No. 25 at 3. DHS does not provide any authority—and the Court has found none—for the proposition that "customer service issues" can constitute trade secrets.

ORDER DENYING MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED
DISCOVERY - 11

2018), for the proposition that a plaintiff cannot state a misappropriation claim with overbroad descriptions of alleged trade secrets such as "design review templates," "fluidics design files," and "source code files"). Here, DHS neither alleges that the information constituted trade secrets nor provides sufficient detail to establish a trade secret.

DHS has failed to demonstrate a likelihood of success on its UTSA and DTSA claims or meet its heightened burden to obtain a mandatory injunction. Thus, the Court's inquiry ends. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (all four *Winter* elements must be satisfied); *Garcia*, 786 F.3d at 740 ("Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three *Winter* elements." (cleaned up)). DHS is not entitled to a TRO on its UTSA and DTSA claims.

### 3. The Breach of Contract Claim

DHS also seeks a TRO regarding its breach of contract claim against Nace, alleging that he has violated his agreements with DHS by disclosing trade secrets and confidential information in the course of competing for the union's business. Dkt. No. 2 at 11–12. The parties dispute whether Washington or California law applies to Nace's non-disclosure agreement and whether any of his confidentiality agreements were supported by consideration. Dkt. No. 14 at 14–16; Dkt. No. 24 at 4–7.

However, the Court need not resolve those issues, because even assuming that the agreements are valid contracts, DHS's allegations are too vague to demonstrate that it is likely to succeed on its breach of contract claim. It sets forth what it has "deduce[d]" regarding Nace's conduct, Dkt. No. 3 at 7, but speculation about his actions is insufficient to demonstrate a likelihood of success on the merits. *See, e.g.*, *Elko, Inc. v. Peters*, No. 3:22-CV-00015-MMD-CLB, 2022 WL 256975, at *5 (D. Nev. Jan. 27, 2022) (declining to find misappropriation based on an inference that because defendants possessed confidential information, they were using it to poach

customers); *Applied Filter Tech.*, 2009 WL 2424802, at *4 (denying TRO when the request was based on an inference that a party competing for a project must have been using confidential information). DHS's reference to Walker's questions about unidentified claims issues—which appears to be the only allegation of disclosure of non-public information—provides insufficient detail for the Court to evaluate the nature of the information, whether it was confidential, and whether its disclosure constituted a breach. Dkt. No. 25 at 3.[3] And Neibert's description of the questions others heard from Walker and how they reacted is less convincing than first-party accounts could have been. *See Applied Filter Tech.*, 2009 WL 2424802, at *5 (finding that the weight afforded to hearsay evidence on a motion for a TRO was "substantially reduced by the less reliable character of the evidence").

DHS likewise fails to satisfy the remaining *Winter* factors. With respect to irreparable injury, DHS argues that "[d]isclosure of confidential information is, on its own," enough to satisfy this factor, but the case on which it relies does not support that proposition, nor is the proposition necessarily true. Dkt. No. 2 at 15 (citing *Rent-A-Car, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)); *see also, e.g. DePuy Synthes Sales, Inc. v. Williams*, No. 1:17-CV-00404-REB, 2017 WL 5011880, at *8 (D. Idaho Nov. 2, 2017). And although the parties agreed in their Mutual Non-Disclosure Agreement that "disclosure of Confidential Information would cause irreparable harm," Dkt. No. 3-1 at 4, "district courts in this circuit give little weight to irreparable harm clauses that pre-declare that any breach of the Agreement will result in irreparable harm," *Super Chefs, Inc. v. Second Bite Foods, Inc.*, No. CV15-00525-SJO(FFMx), 2015 WL 12914441, at *4 (C.D. Cal. June 11, 2015) (cleaned up). In other words, an agreement does not excuse the moving party from its burden of showing that

---

[3] While the Court is mindful that DHS would not want to reveal confidential information in public filings, it could have moved to seal filings if appropriate. LCR 5(g).

1    irreparable harm is likely. *Id.* (citing *Winter*, 555 U.S. at 22). DHS also argues that it could suffer

2    irreparable harm if Nace uses its confidential information to woo away its clients. Dkt. No. 2 at

3    16. It is true that the loss of customer relationships can constitute irreparable harm. *See, e.g.*,

4    *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). But while

5    DHS alleges that Nace disclosed harmful information about claims issues to Walker, it also states

6    that DHS had "addressed and improved" those issues after Nace left the company and apparently

7    conveyed that information to Walker, diffusing the sting of Walker's questions. Dkt. No. 25 at 3

8    (stating that if DHS had not fixed the issues, the questions "would have" effectively killed DHS's

9    bid). Therefore, DHS seems unlikely to suffer irreparable harm based on that alleged disclosure.

10         DHS has not demonstrated a need for immediate relief either. It states that the bidding

11   process for the union contract is complete and that the "client is nearing a decision." Dkt. No. 25

12   at 2. And it presents no evidence that Nace is continuing to disclose confidential information to

13   the union or any other entity. *See, e.g.*, *Ossur Holdings, Inc. v. Bellacure, Inc.*, No. C05-1552-JLR,

14   2005 WL 3434440, at *9 (W.D. Wash. Dec. 14, 2005) (denying motion for TRO where plaintiffs

15   did not face imminent, irreparable injury as a result of defendant's conduct).

16         Nor do the balance of equities tip in DHS's favor. DHS claims that the balance of hardships

17   favors the plaintiff in a trade secrets case, Dkt. No. 2 at 17, but as set forth above, it has not shown

18   a likelihood of success on that claim. And its contention that it is merely seeking to preserve the

19   status quo is belied by its request for a mandatory injunction. Dkt. No. 2-1 at 4. Absent a showing

20   that Nace is disclosing DHS's confidential information, DHS has not demonstrated that the balance

21   of equities tips in its favor or that an injunction is in the public interest. Therefore, the Court denies

22   its request for a TRO against Nace.

23

24

ORDER DENYING MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED
DISCOVERY - 14

**D.      Plaintiffs Are Not Entitled to a TRO Against the Doe Defendants**

DHS seeks a TRO against all Defendants, including the 50 "Doe" defendants they have included in the complaint. Dkt. No. 1-2 at 2; Dkt. No. 2-1 at 3–4. For the same reasons DHS is not entitled to a TRO against Nace, the Court denies its request for a TRO against the Doe defendants.

**E.      Plaintiffs Are Not Entitled to Expedited Discovery**

DHS moves for expedited discovery from Miller and Nace. Dkt. No. 4 at 1. It seeks to depose them on or before March 27, 2023 and require them to respond to discovery requests within five days of service. *Id.* Nace did not timely respond to the motion for expedited discovery, stating that he assumed it would be renoted for March 31, 2023 even though the Court ordered Defendants to respond to the motions for a TRO and expedited discovery by Monday, March, 20, 2023. Dkt. No. 11; Dkt. No. 14 at 2 n.1. Miller filed a timely opposition to the motion and argues that DHS's unsupported allegations do not demonstrate good cause. Dkt. No. 22 at 1. DHS filed an untimely reply, which was stricken by the Court. Dkt. No. 28.

A party "may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except . . . when authorized by [the Federal Rules of Civil Procedure], by stipulation, or by court order." Fed. R. Civ. P. 26(d)(1). To deviate from the standard pretrial schedule, including by seeking expedited discovery before a Rule 26(f) conference, the moving party must demonstrate good cause. *See, e.g.*, *Amazon.com, Inc. v. Dafang Haojiafu Hotpot Store*, No. C21-766-RSM, 2022 WL 2511742, at *2 (W.D. Wash. June 8, 2022) (finding good cause for expedited third-party discovery to identify defendants); *see also* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Amazon.com, Inc. v. Autospeedstore*, No. C22-1183 MJP, 2023 WL 1869300, at *1 (W.D. Wash. Jan. 11, 2023) (quoting *Semitool, Inc. v. Tokyo*

1    *Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002)). Courts commonly consider the

2    following non-exclusive factors in determining the reasonableness of expedited discovery:

3    (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the

4    purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with

5    the requests; and (5) how far in advance of the typical discovery process the request was made. *Id.*

6           DHS argues that expedited discovery is "necessary" for it to learn the identity of the Doe

7    defendants and to demonstrate "the extent of Defendants' misappropriation of DHS confidential

8    and trade secret information[.]" Dkt. No. 4 at 2, 8.

9           Although courts may permit expedited discovery to allow parties to learn the identity of

10   Doe defendants, *see, e.g.*, *Kovlenko v. Doe*, No. 2:22-cv-01578-TL, 2022 WL 17582483, at *2–3

11   (W.D. Wash. Dec. 12, 2022), DHS has not shown good cause to do so on an expedited basis, at

12   least on the record currently before the Court. As set forth above, it has not shown that it faces

13   imminent danger of irreparable harm.

14          With respect to DHS's second goal of investigating the extent of Defendants'

15   misappropriation of DHS's confidential information and trade secrets, DHS has not narrowly

16   tailored its requests to obtain evidence relevant to its forthcoming motion for preliminary

17   injunction. Dkt. No. 4-1 at 22–24; *Palermo v. Underground Sols., Inc.*, No. 12-CV=1223–WQH-

18   BLM, 2012 WL 2106228, at *3 (S.D. Cal. June 11, 2012) (Plaintiff's proposed expedited discovery

19   "requests are not narrowly tailored to obtain evidence relevant to [Plaintiff's] motion for

20   preliminary injunction," but "[i]nstead . . . appear[ ] to be a vehicle to conduct the entirety of his

21   discovery prior to the Rule 26(f) conference."). Although some limited expedited discovery may

22   be warranted given Miller's admitted possession of DHS equipment and emails without DHS's

23   authorization, and given the lack of clarity regarding precisely what Nace told Walker, DHS's

24   proposal is overbroad. For example, although DHS has not supplied anything but speculation that

Nace may have retained DHS files, it seeks to discover all electronic devices, emails, cloud storage accounts used by Nace since January 1, 2022 and subject them to forensic examination. Dkt. No. 4 at 8; Dkt. No. 4-1 at 20–21, 24. In short, much of the discovery DHS seeks "is not 'narrowly tailored to obtain information relevant to a preliminary injunction determination' and instead goes to the merits of [DHS's] claims in this action." *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1069 (C.D. Cal. 2009); *see also Extreme Reach, Inc. v. PriorityWorkforce, Inc.*, No. CV 17-6796 SJO (EX), 2017 WL 10544621, at *3 (C.D. Cal. Oct. 18, 2017) (in trade secret misappropriation and breach of contract case, plaintiff's discovery requests, including a request for "forensic images of *all* computers, server, hard drives, or other storage devices" used by defendants, were "wholly incommensurate with Plaintiff's stated purpose of assessing the necessity of a preliminary injunction" and instead would "require Defendants to commence the wholesale discovery process months before Plaintiff"); *Citizens Bank, N.A. v. Margolis*, No. 20-CV-12393, 2020 WL 5505383, at *3 (E.D. Mich. Sept. 11, 2020) (request for a forensic review of defendant's personal mobile devices, computers and tablets, and work email account were "overbroad at this stage of the litigation"). Therefore, the Court denies the motion for expedited discovery. However, DHS may renew its motion with an appropriately tailored proposed scope of discovery.

## III.   CONCLUSION

For the foregoing reasons, the Court DENIES DHS's motions for a temporary restraining order, Dkt. No. 2, and for expedited discovery, Dkt. No. 4.

Dated this 6th day of April, 2023.

Lauren King
United States District Judge